UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

WILNER JEAN-PIERRE,

    Plaintiff,

v.                                          Case No.: 2:18-cv-98-FtM-38MRM

NAPLES COMMUNITY HOSPITAL,
INC.,

    Defendant.
_____/

## **OPINION AND ORDER**[1]

Before the Court is Defendant Naples Community Hospital, Inc.'s ("NCH") Dispositive Motion for Summary Judgment (Doc. 42) and Plaintiff Wilner Jean-Pierre's response in opposition (Doc. 52). For the reasons below, the Court grants the motion.

## **BACKGROUND**

This is a religious discrimination suit. NCH hired Jean-Pierre to be a clinician technician ("CT") in its 4-South Oncology Department and then in its Outpatient Infusion Services Department ("OPIS"). As a CT, Jean-Pierre provided direct patient care under a nurse. His job duties included taking vital signs, administering EKGs, and running samples to laboratories. Both jobs required weekend shifts, and Jean-Pierre

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or websites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink stops working or directs the user to some other site does not affect the opinion of the Court.

acknowledged so.  (Doc. 48-4 at 3; Doc. 48-5; Doc. 48-8).  Jean-Pierre worked at NCH for about five years until he was fired on November 7, 2012.[2]  (Doc. 48-15).

From the start of his employment, Jean-Pierre told NCH he was a Seven-Day Adventist who could not work sundown Friday to sundown Saturday—his Sabbath.  And NCH accommodated his religious beliefs for almost all his tenure with creative scheduling and allowing him to work only Sundays.  (Doc. 42 ¶¶ 2, 4, 7; Doc. 52 ¶¶ 2, 4, 7; Pl. Dep. 118:13-15).  That scheduling accommodation changed in October 2012.

At that time, Jean-Pierre had been working in the OPIS unit for about two years.  OPIS provides antibiotic and chemotherapy infusions to patients.  Because OPIS treats outpatients only, it sees about seventy-five patients per day.  This patient flow is higher than other NCH departments.  (Doc. 42 ¶ 5; Doc. 52 ¶ 5).  OPIS is open seven days per week.  The CTs typically work eight-hour shifts, Monday through Friday and every other weekend.  For Saturday shifts, OPIS preferred to schedule two CTs because it was the busiest day.  But, based on anticipated patient needs and to accommodate Jean-Pierre, it sometimes scheduled only one CT.

OPIS started 2012 with four CTs.  It lost one in April and another in October.  The latter resignation, given on October 5 and effective one week later, left OPIS with only two CTs to cover the weekend shifts: Jean-Pierre and Vanie Cineus.  NCH advertised for the open CT position within a few weeks and filled it in early November.  (Doc. 43-20).

On October 8, supervisors met with Jean-Pierre to discuss him having to work Saturdays because of the staffing shortage.  The supervisors were Dora Krauss, Director of Education and then-Interim Director of OPIS, and Sheryl Voivedich, Nurse Manager

---

[2] Unless otherwise specified, all dates occurred in 2012.

2

for OPIS. (Doc. 48-29 at 1; Doc. 49-1 at 1). They told Jean-Pierre he would be scheduled to work every other Saturday beginning October 20 as a matter of patient safety. (Pl. Dep. 106:25-107:7). Up to the recent resignation, Krauss explained that OPIS could work around Jean-Pierre's request but could no longer do so with only one other CT and the busy season approaching. (Doc. 42 ¶ 13; Doc. 52 ¶ 13). This proposed schedule, however, was not set in stone. Krauss told Jean-Pierre he could switch shifts with another CT to avoid working on Saturdays and referred him to NCH's Staffing Office to see if they could assist in any way. (Doc. 42 ¶ 14; Doc. 52 ¶ 14; Pl. Dep. 108:18-21).

Jean-Pierre responded that he would not work Saturdays because of his religion. (Pl. Dep. 107:5-7). He also reminded his supervisors about his longstanding agreement with NCH never to work on the Sabbath. Jean-Pierre was then warned that, absent alternative arrangements, he would be disciplined if he did not show up for his scheduled Saturday shift. Jean-Pierre responded he would accept any reprimand as he was not working. (Pl. Dep. at 107:16-19). The meeting ended with the supervisors telling Jean-Pierre that he need not decide at that moment if he would work the scheduled Saturday. They suggested he talk to someone at home or church before making a final decision. A few days later, Jean-Pierre gave Krauss a letter from his pastor that outlined his religious convictions.

Saturday, October 20 came and went. Jean-Pierre never reported to work. Nor did he call NCH's staffing center before his shift to report his soon-to-be absence. Jean-Pierre's no-show left OPIS with no CT. But, according to Jean-Pierre, "the RNs performed their own tech work, which did not pose a problem." (Doc. 52 ¶ 13). Jean-Pierre received

a three-point "reminder" under NCH's point-based progressive discipline policy for skipping the scheduled shift. (Doc. 48-45 at 4-5).

At this point, background on NCH's point-based progressive discipline policy provides context. (Doc. 43-15). Violating an NCH policy is a one-point reminder. A repeat infraction or serious first-time infraction is three points, and a final reminder for a repeat violation is five points. The policy also gives examples of unsatisfactory behavior like "[f]ailure to report to work as scheduled following denial of request for time off" is a five-point reminder. (Doc. 43-15 at 14). Twelve points in a rolling twelve-month period makes an employee eligible for firing. (Doc. 43-15 at 9). As of October 8, when his scheduled changed, Jean-Pierre had four points. (Doc. 48-45 at 1-3).

On October 22, Jean-Pierre received a memorandum outlining the three-point reminder. It said

> Wilner, while I understand that each absence may be legitimate, a no call no show is a serious infraction. We need to be able to count on you to come to work on a regular basis. This 3-point corrective action prevents you from applying for a transfer to six months. The next level of corrective action for a second no-call no-show within the next twelve month period is a 5-point reminder, which also prevents you from eligibility for the next full pay increase and/or bonus. Including this 3-point corrective action points are 7. An accumulation of twelve or more points may result in the termination of your employment.

(Doc. 48-45 at 4-5; Pl. Dep. 113:4-114:2). Jean-Pierre did not sign the memorandum, and the employee comment section said, "Employee stated he absolutely will not work on Saturdays due to his religious beliefs. He will not change that." (Doc. 48-45 at 4-5). Jean-Pierre was also reminded that, although NCH respected his religious beliefs, OPIS counted on him to work his scheduled shifts. (Pl. Dep. 114:3-7, 115:23-116:2).

That same day, Jean-Pierre learned he was scheduled to work Saturday, November 3. He was reminded that not working the shift would lead to a five-point reminder and make him eligible for termination of employment. Jean-Pierre said he understood the ramifications but still would not work the weekend shift. (Pl. Dep. 13:21).

One day before Jean-Pierre's November 3 shift, he met with Michelle Zech, a manager in NCH's Human Resources Department. (Doc. 48-41). Knowing Jean-Pierre's religious observance, Zech discussed Jean-Pierre applying to transfer to a *per diem* position or different full-time position with hours that could better accommodate him. (Doc. 48-41; Pl. Dep. 117:15-23, 120:15-19). Zech suggested a per diem position because those employees set the days they can work, meaning Jean-Pierre could control not working on Saturdays. Zech also showed Jean-Pierre how to find open positions on NCH's intranet. Jean-Pierre, however, was not interested in any available job. (Doc. 42 ¶ 17; Doc. 52 ¶ 17).

Saturday, November 3 came, and Jean-Pierre did not show for work. As warned, his absence led to the following five-point reminder:

> As of Saturday, November 3, 2012, your attendance record is unacceptable. My previous meetings with you to resolve the situation have not been successful. . . This 5-point reminder prevents you from applying for a transfer outside of your department for six months, and makes you ineligible for the next full pay increase and/or bonus. Including this 5-point reminder, your accumulated points are 12. An accumulation of twelve or more points during the past twelve months may result in termination of your employment.

(Doc. 48-45 at 6-7; Doc. 42 ¶ 20; Doc. 52 ¶ 20). Having accumulated twelve points, NCH decided to fire Jean-Pierre days later. (Doc. 48-14).

5

Jean-Pierre responded by filing a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). (Doc. 48-17). He claimed that NCH fired him because of his religious beliefs in violation of Title VII of the Civil Rights Act of 1964. Years passed before the EEOC issued Jean-Pierre a Notice of Right to Sue letter. (Doc. 48-17 at 8-11). This lawsuit followed.

Jean-Pierre sues NCH under Title VII for intentional religious discrimination, failure to accommodate, and retaliation. (Doc. 23). Count I alleges that NCH intentionally discriminated against Jean-Pierre because it fired him for not working on his Sabbath. Count II similarly alleges that NCH "failed and refused to provide Jean-Pierre with a reasonable accommodation for his religious beliefs even though a reasonable accommodation was requested, was available, and could have been made without any undue hardship." (Doc. 23 at 6). Finally, Count III asserts that NCH fired him after he requested a religious accommodation. Discovery has closed, and NCH has moved for summary judgment on all counts.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. And an issue is material "if it is a legal element of the claim

under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

To prevail on summary judgment, the movant must "negat[e] an essential element of the nonmoving party's case or show[ ] there is no evidence to prove a fact necessary to the non-moving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). If the movant does either, the burden shifts to the non-movant to show a genuine factual issue exists for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Identifying "[t]he mere existence of a scintilla of evidence" or arguing "metaphysical doubt as to the material facts," however, is not enough. *Anderson*, 477 U.S. at 259, 261; *see also Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997) (stating the non-moving party "must come forward with specific factual evidence, presenting more than mere allegations").

In considering motions for summary judgment, courts view the evidence and make all factual inferences in a light most favorable to the non-movant. All reasonable doubts about the facts are also resolved in favor of the non-movant. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But "the judge's function is not [her]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## TITLE VII LEGAL STANDARDS

Title VII prohibits an employer from firing an employee based on his religion. 42 U.S.C. § 2000e-2(a)(1). The term "religion" includes "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate . . . an employee's . . . religious observance or practice without

7

undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). Put simply, "[a]n employer has a 'statutory obligation to make reasonable accommodates for the religious observances of its employees, short of incurring an undue hardship.'" *Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1293 (11th Cir. 2012) (citation omitted).

To succeed on a claim based on an employer's failure to accommodate religious practices, the plaintiff must first establish a *prima facie* case by showing that he (1) had a bona fide religious belief that conflicted with an employment requirement; (2) informed his employer of the belief; and (3) was fired for not complying with the requirement. *See Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1321 (11th Cir. 2007). If a prima facie case is shown, the burden shifts to the employer to demonstrate it offered the employee a reasonable accommodation or could not do so without undue hardship. *Patterson v. Walgreen Co.*, 727 F. App'x 581, 585 (11th Cir. 2018) (citation omitted). Here, the parties agree that Jean-Pierre has shown a prime facie case. They square off over whether NCH offered a reasonable accommodation and undue hardship.

Title VII does not define the term "reasonably accommodate." *Beadle v. Hillsborough Cty. Sherriff's Dep't*, 29 F.3d 589, 592 (11th Cir. 1994). Courts, however, say "a reasonable accommodation is one that eliminates the conflict between employment requirements and religious practices." *Walker v. Indian River Transport. Co.*, 741 F. App'x 740, 746 (11th Cir. 2018) (internal quotations and citations omitted). employer, however, need not accommodate "at all costs." *Morrissette-Brown*, 506 F.3d at 1322 (citation omitted). The Eleventh Circuit has explained that

> compliance with Title VII does not require an employer to give an employee a choice among several accommodations; nor

8

> is the employer required to demonstrate that alternative accommodations proposed by the employee constitute undue hardship. Rather, the inquiry ends when an employer shows that a reasonable accommodation was afforded the employee, regardless of whether that accommodation is one which the employee suggested.

*Beadle*, 29 F.3d at 592 (internal citations omitted); *see also Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1986) (stating "any reasonable accommodation by the employer is sufficient to meet its accommodation obligation"). The employer is not the only party with an obligation under this standard. The employee too must "make a good faith attempt to accommodate [his] religious needs through means offered by the employer." *Walden*, 669 F.3d at 1294.

An employer need not even offer a reasonable accommodation when doing so places an undue burden on its business. 42 U.S.C. § 2000e-2e(j). An undue hardship is one in which the employer must bear more than a "de minimis cost" in accommodating an employee's religious beliefs. *Trans World Airlines, Inc. & Hardison*, 432 U.S. 63, 75 (1977). A de minimis cost goes beyond money; it also includes "the employer's burden in conducting its business." *Beadle v. City of Tampa*, 42 F.3d 633, 636 (11th Cir. 1995).

## DISCUSSION

Before addressing the merits of NCH's motion for summary judgment, the Court must frame its analysis. All three claims, although titled differently, center on NCH's alleged failure to accommodate Jean-Pierre's religious observance. The Court thus limits its discussion to deciding whether NCH provided Jean-Pierre a reasonable accommodation or suffered an undue hardship to continue giving him Saturdays off. *See Patterson*, 727 F. App'x at 585 (finding no error in the district court collectively analyzing plaintiff's religious discrimination and retaliation claims where they were based on his

reasonable accommodation claim). Against this backdrop, the Court turns to NCH and Jean-Pierre's arguments on summary judgment.

NCH argues it accommodated Jean-Pierre's religious observance for nearly five years until it was no longer possible because of understaffing. And when OPIS supervisors had to schedule Jean-Pierre on Saturdays, NCH offered him several reasonable accommodations: (1) switch shifts with other CTs or work with the Staffing Office; (2) transfer to a *per diem* position; and (3) transfer to another department that could better accommodate his Sabbath. NCH also asserts it would have been an undue hardship to keep Jean-Pierre off Saturday shifts because of patient needs.

For Jean-Pierre's part, he argues the accommodations were neither reasonable nor feasible. He says he only had one coworker (Cineus) to swap shifts, and NCH did not want to pay her overtime. Jean-Pierre continues that transferring to a per diem position was not reasonable because those employees earn less money and benefits than full-time CTs. Further, because he met with Zech the day before his second Saturday shift, Jean-Pierre says he did not have enough time to apply, interview, and transfer to another position before getting the five-point final reminder action. According to Jean-Pierre, the blame for this situation lies with NCH: he gave enough notice of his inability to work the Saturday shifts and NCH did not take reasonable steps to address any staffing shortage.

After reviewing the parties' arguments, record, and applicable law, the Court finds this case is controlled by *Patterson v. Walgreens Co.*, 727 F. App'x 581 (11th Cir. 2018).[3] In *Patterson*, the plaintiff was a Seventh Day Adventist who sued his former employer,

---

[3] The decision awaits a ruling from the Supreme Court on certiorari.

Walgreens, for religious discrimination, failure to accommodate religious practices, and retaliation under Title VII. He too could not work the Sabbath. When hired, he told Walgreens he would not work Friday night to Saturday night, and Walgreens accommodated him. As time progressed so did the plaintiff's career. He became a training instructor in a call center that operated seven days a week. To work around his religious observance, regular training classes were scheduled between Sunday and Thursday. Emergency trainings, however, were unpredictable and sometimes landed on Fridays and Saturdays. In those situations, the plaintiff either swapped shifts with willing coworkers or was disciplined for not coming to work.

Matters came to a head when the plaintiff had one day's notice to conduct an emergency Saturday training. Walgreens told the plaintiff he had to find a solution. The plaintiff contacted his only counterpart who was unavailable. Rather than contacting anyone else, the plaintiff left his supervisor messages saying he would not report to work. And he didn't.

About a week later, Walgreens representatives met with the plaintiff. He reiterated that he would not work his Sabbath. Walgreens suggested he return to his prior position or look for another job with a larger employee pool from which he could more easily swap shifts. He then asked if either option guaranteed not working on his Sabbath. The guarantee was declined. Walgreens then fired him because it could not accommodate his request never to work his Sabbath.

The plaintiff sued and the district court dismissed his Title VII claims on summary judgment. The plaintiff appealed, and the Eleventh Circuit affirmed. The appellate court

<mark>11</mark>

found Walgreens offered the plaintiff reasonable accommodations that he did not capitalize on or refused to consider:

> Walgreens met is obligation under Title VII by allowing [the plaintiff] to arrange a schedule swap with other employees when they were willing to do so. . . Walgreens was not required to ensure that [the plaintiff] was able to swap his shift, nor was it required to order another employee to work in his place. . .
>
> Not only that, but after [the plaintiff] missed the training session that gave rise to this case, Walgreens' human resources manager encouraged him to seek a different position within the company . . . [The plaintiff] did not want to pursue that option. But he had a duty to make a good faith attempt to accommodate his religious needs through the means offered by Walgreens.

727 F. App'x at 587 (internal citations omitted). The court also said that Walgreens did not need to guarantee the plaintiff a position where he would not work his Sabbath. Nor did Walgreens have to give the plaintiff his preferred accommodation: requiring other employees to conduct trainings during his Sabbath. What is more, it found that allowing the plaintiff to retain his position with a guarantee he would never work Friday nights or Saturdays was an undue hardship for Walgreens to operate its call center.

*Patterson*'s facts are analogous to this case.[4] Both involve Seventh Day Adventists who worked jobs that required weekend shifts. Both NCH and Walgreens accommodated the employees' religious observance until it became unfeasible. Both the employees remained steadfast on never working Saturday shifts and refused to find another employee to swap shifts or transfer to another position. Both left their employers

---

[4] Facts are not the only thing this case shares with *Patterson*. Jean-Pierre's attorney also represented the plaintiff in *Patterson*.

12

with a single choice: accommodate on their terms or fire them. And when the employers fired them, they sued for religious discrimination.

NCH unsurprisingly relies on *Patterson* to support its summary judgment motion, arguing it is directly on point. But *Patterson* makes no appearance in Jean-Pierre's opposition—not even a mention. It is not this Court's function to make arguments on Jean-Pierre's behalf. Having failed to distinguish *Patterson*, Jean-Pierre must live with the consequences. For the same reasons explained in *Patterson*, the Court finds NCH is entitled to judgment as a matter of law.

NCH accommodated Jean-Pierre's religious observance for nearly five years. And it continued to meet its Title VII obligations after it became short-staffed in October 2012 and had to schedule Jean-Pierre for Saturdays shifts. This is because Jean-Pierre could have swapped those shifts with someone else, but he never asked. *See Beadle*, 29 F.3d at 593 (finding a reasonable accommodation where the employer allowed the plaintiff to arrange shift swaps with his co-workers). Jean-Pierre, however, suggests the onus was on NCH to find coverage and train someone if needed. Not only has the Eleventh Circuit rejected this argument, but Jean-Pierre's position cuts against him. *Patterson*, 727 F. App'x 587 (citation omitted) (stating "Walgreens was not required to ensure that [the plaintiff] was able to swap his shift"). If NCH had time to find someone to cover Jean-Pierre's shift, so did Jean-Pierre. Jean-Pierre took no steps to find coverage on his own or through the Staffing Office. *See Walden v. Centers for Disease Control & Prevention*, 669 F.3d 1277, 1294 (11th Cir. 2012) (stating the defendant's "proffer of a reasonable accommodation triggered [the plaintiff's] accompanying duty to make a good faith attempt to accommodate her needs through the offered accommodation"). Nor did he offer to

13

help train a willing CT from another department in the days before his Saturday shifts. In short, Jean-Pierre failed to comply with his own duty to make a good-faith attempt to accommodate his needs through the offered accommodation. *Walden*, 669 F.3d at 1294 (finding the plaintiff did not comply with her good-faith duty "when she elected not to apply for any positions").

Title VII did not require NCH to find coverage for Jean-Pierre. Nor was NCH required to force his co-workers or a supervisor to cover the shifts. *See Hardison*, 432 U.S. at 81 (explaining that an employer does not have to accommodate an employee's religion "at the expense of others who had strong, but perhaps nonreligious, reasons for not working on weekends"); *Howard v. Life Care Centers of Am., of Tennessee*, No. 5:06-cv-276OC-10GRJ, 2007 WL 5023585, at *5 (M.D. Fla. Oct. 26, 2007) ("The employer is neither required to offer other accommodation options nor show that alternative accommodations proposed by the employee would result in an undue hardship."). Permitting shift swaps was enough for NCH to satisfy Title VII.

Together with swapping shifts, NCH also offered Jean-Pierre a transfer to a per diem position or another department that could better accommodate his religion. *See Walden*, 669 F.3d at 1294 (finding the employer "reasonably accommodated [the plaintiff] when it encouraged her to obtain new employment with the company and offered her assistance in obtaining a new position"). Jean-Pierre dismisses these accommodations, arguing a transfer would not have eliminated the Saturday work. His position amounts to NCH guaranteeing that he would never work Saturdays, which the Eleventh Circuit has rejected. *See Patterson*, 727 F. App'x at 587; *Telfair v. Fed. Express Corp.*, 567 F. App'x 681, 684 (11th Cir. 2014) (finding the plaintiff's "speculation that no other position would

14

have guaranteed they would not have to work on Saturdays similarly is unsupported by the record, especially given their failure to apply for any other positions").

Jean-Pierre's challenge to the timing of NCH offering the transfer fares no better. He essentially argues that NCH was disingenuous in any transfer because it waited until the day before his second Saturday shift to talk about transferring. Even so, Jean-Pierre showed no interest in transferring without a guarantee for no Saturday shifts. Because he was not open to a transfer, he closed any conversation about NCH expediting the hiring process for another position or the pay and benefits for the per diem position. *See Patterson*, 727 F. App'x at 587.[5] NCH extended Jean-Pierre the reasonable accommodation of transferring to a new position before firing him. *Walker*, 741 F. App'x at 740 (finding that the employer provided a reasonable accommodation by offering the plaintiff other routes so he could have Sundays off). So, not only did Jean-Pierre forego any effort to find another position in NCH, he dismissed the hospital's attempts to help him.

Even setting aside the reasonable accommodations, it is not lost on the Court that NCH is in the healthcare business. Title VII does not require NCH to compromise its business of caring for patients seven days per week. Nor does Title VII require NCH to wait until a patient is harmed from Jean-Pierre's no-show to claim undue hardship. It was essential to NCH's business to require weekend shifts from its staff. NCH schedules employees based on patient needs and staff, and it did not have to compromise meeting patients demands when understaffing prevented it from continuing to give Jean-Pierre

---

[5] Although per diem CTs were not eligible for all the benefits of a full-time position, per diem CTs received a higher pay rate in exchange. (Doc. 42 ¶ 18; Doc. 52 ¶ 52).

Saturdays off. So, even if the Court were to conclude a reasonable accommodation was not offered, NCH has demonstrated an undue hardship and the result would be the same.

In sum, NCH offered Jean-Pierre reasonable accommodations that he either failed to take advantage of or refused to consider, and the accommodation he insisted on would have posed an undue hardship to NCH.

Accordingly, it is now

**ORDERED:**

(1) Defendant Naples Community Hospital, Inc.'s Dispositive Motion for Summary Judgment (Doc. 42) is **GRANTED**.

(2) The Clerk is **DIRECTED** to enter judgment, terminate all pending deadlines, and close the file.

**DONE** and **ORDERED** in Fort Myers, Florida this 27th day of September 2019.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record